May it please the Court. My name is Richard Angino, and I'm from Harrisburg, Pennsylvania. I've been representing Mr. and Mrs. Tucker now for almost seven years. First of all, I started representing them when they were being sued by Interscope and Death Row, and I represented them for about a year and a half there, and then since there with regard to the malicious prosecution case. In terms of understanding this damage issue that is before the Court, one has to understand that Mrs. Tucker was accused of extortion, conspiracy, racketeering, for one meeting that she had when she was meeting with her board of the National Political Congress of Black Women, and Suge Knight invites himself there to discuss gangster rap, and a room full of people there said, this is wrong that you are putting out these lewd, misogynistic, drug-infested types of gangster rap music, and we would like for you to be able to profitably put out better music. One meeting at a board, Mrs. Tucker is there with a whole group of other individuals. They go away. After that, there is one meeting with Dionne Warwick. Mrs. Tucker isn't even there. There is another meeting set up again with Dionne Warwick when Mrs. Tucker is not there. As a result of this one meeting, Mrs. Tucker somehow becomes the focus of litigation that goes on for years, involves 11 depositions of Mrs. Tucker, consuming 2,700 pages of depositions. It involves their hiring investigators to go into every aspect of her life. It involves her name appearing in Source magazine with a red line drawn through her name along with a lot of very well-known black individuals. So that what happens is when we are finally able to get in there and force them to drop this three-year action, and then we start what we had to do was first get the one drop to start the malicious prosecution action, we go down the road of more depositions and years of time with everything being given on our side and nothing on their side. We got no discovery. They admit they have 48 boxes of files. And all they do is say it's all protected by either attorney-client privilege or work-product privilege. And believe it or not, the magistrate lets them do that. Right. But did you file objections to the magistrate, Judge? I did not, Your Honor. Doesn't that foreclose the appeal of that issue? Well, Your Honor, I don't think it does because we're dealing with an issue of law that you're observing at the appellate level in terms of everything here is dealing with legal issues because we're now at the appellate level. So it's not the aspect of did I go to the judge from the magistrate, because whatever he would have done, if he would have affirmed the magistrate, you could have appealed it. If he would have reversed the magistrate, you know, what we're dealing with here, Your Honor, is a situation that is purely a matter of law. And we're not looking at the technicality of did you actually file something with regard to this getting of these 48 boxes of materials. Well, let's talk about something, evidence that was in your hands that you could have provided on the damages claim. The district court granted summary judgment because he said you had failed to provide evidence of economic damages. It's just not true, Your Honor, because first of all, let us start with a malicious prosecution case is a tort case. Like any other tort case, there are economic damages and there are general damages. With regard to the economic damages, the court focused on one attorney, Patton Boggs, who represented the Tuckers for a short period of time, during which time she withdrew. I just heard somebody talking about withdrawing as counsel. She withdrew as counsel because she hadn't been paid. A matter of record, Your Honor, I have the exhibits attached here of Patton Boggs' letter. Is there a letter that says she was representing your client's pro bono? We have — this is certainly a factual issue. If you want to get down to this one isolated issue, the first two letters are a letter to the Tuckers saying you owe us $8,000. You also owe local counsel $4,000. Patton Boggs goes to the judge and says, let us withdraw as counsel because we have not been paid. That's clearly part of this record. Later on, when I write to get all of these documents verifying their time, then you have a letter where it says, here are our documents, but please recognize we handled this on a pro bono basis. Pro bono means as to your time. Pro bono does not mean as to your expenses. The claims in the letters that we talked about being a matter of record here say you owe us $8,000 and so many cents. You owe forwarding counsel $4,000 and so many cents. Matter of the record also is our own power of attorney and contingent fee agreement. I'm not handling this on a pro bono basis. The power of attorney, which is on page 120 of the record, clearly shows the manner in which I'm handling this case is where they are responsible for all of the expenses. Your Honor, as a matter of the simplest understanding, is that 11 days of depositions in California, Boston, New York, attorneys going to California, Boston, New York, Washington, D.C. I'm not a hummingbird. I can't fly here at no cost. Obviously, there is some cost when one goes from Harrisburg to California to Boston. But all of these things have to do with one small aspect, and that's why what we're looking at, Your Honor, is the Court, in its opinion, says, and I made a note here on page 836, plaintiff's opposition does not allude to any source of damages besides attorney's fees. The whole thing is, Your Honor, if we turn to page 665 of the record, defense is responsible for all of the expenses saying I'm disorganized. I'm not disorganized. Every allegation that they made, we followed with a separate paragraph pointing out our response to their allegations. And if you look at 665, it's where the allegations begin as to damages. And what they say, what I've said in response, paragraph 48, their argument, plaintiffs have testified in numerous depositions as to their, quote, damages, and how and in what manner the lawsuits brought against them affected their lives. I then quote from specific language in depositions as to Mr. and Mrs. Tucker in 13 depositions. The last deposition was just on damages. There's a whole day of depositions on damages where they were asked, how have you been affected? I go on to 666. Copies of these depositions are being supported as part of the record. The Tucker's doctor, Dr. Mignot's deposition was taken by both defendants and plaintiffs. When you're talking about damages, you've got a doctor who has related the stress that Mrs. Tucker suffered to this action. The word incur. Every day I bring actions where there are medical bills. It's not a question of whether those medical bills at the moment have been paid or not paid. Once you have a medical bill, it's been incurred and you can claim damages for a medical bill. Obviously, Dr. Mignot is not another person handling these things on pro bono basis and not having medical bills where he charges for people who come for attention. I went on to say 58 pages of billing records from patent bonds for which they say pro bono. Counsel, we have the record and your time's up. So thank you very much. Good morning, Your Honor. I'm Steve Marienberg and I represent David Kenner, Jeffrey Thomas, Charles Ortner, who are partners in Paul Hastings, Janowski & Walker, that law firm itself, as well as Interscope Records on this appeal. I will be very brief, Your Honors. The issue is not what evidence Mr. Angino, Plaintiff's counsel, can call to this Court's attention on appeal. Could you speak up a little? Sure. The issue is not what evidence might be called by counsel to this Court's attention on appeal, but what was in the record in the thousands and thousands of pages that were filed in the court below that would indicate that the plaintiffs were entitled to go forward that they had any evidence of damages. And the fact that the matter is – excuse me – and what the plaintiffs needed to show with respect to economic damages under Saganowski and Vertero was that they had out-of-pocket expenses. Malicious prosecution suits are disfavored and they are a very special breed of tort suits, and in those cases, the damage is out-of-pocket expenses. And there was no evidence before the court below of any out-of-pocket expenses. Patton Boggs indicated that they pursued the matter on behalf of the Tuckers on a pro bono basis. But what about his argument that that didn't include expenses or that Patton Boggs had quit handling the matter because they weren't being paid? Well, there were a number of reasons, first of all, why Patton Boggs withdrew, and including that they were troubled by some of the things that they were asked to do. Well, that's not in the record, is it, counsel? Well, it is in the record in the sense that their letter to the Tuckers explaining why they were withdrawing does mention those facts. But the issue is, yes, there is the letter that Mr. Angino refers to, but there is no evidence that those fees were ever paid, excuse me, that those expenses were ever paid or that they were ever pursued. And, in fact, since the letter came in 1997 and we're now in 2003, the statute of limitations on any such claim for expenses, much less fees, would have long since run. And so there's no evidence of any out-of-pocket expenses or fees paid by Mrs. Tucker or Mr. Tucker in this case. Now, they do claim emotional. Mrs. Tucker claims emotional distress. She does. Over the years of this issue and the underlying litigation. She does claim emotional distress, Your Honor. But what she does not prove is any look at, for example, paragraph 48 of the rambling response to our separate statement, what the stress seems to flow from are not the filing of the lawsuits in her statement or in the statements that are excerpted by her counsel. We actually don't have a declaration from Mrs. Tucker below. But she's having, she says she's having death threats. She says that an ad was placed in Source magazine which ostensibly incited people to make these death threats, and that these are the things that are causing her stress. There's no evidence in the record creating a nexus between the filing of the underlying lawsuits and her stress. And the ---- Kennedy, is there any connection between the death threats and the filing of the underlying lawsuit? Not. There's no evidence of that, Your Honor, nor do I think that there could be. What we have ---- In point of fact, Your Honor, there are ---- Mrs. Tucker over time has filed several lawsuits. We've given the citation, for example, to the third ---- one of the Third Circuit decisions. And Mrs. Tucker is claiming damages, stress damages in that case, in those cases, from the same acts that she is claiming here, the ad, the lyrics in rap songs that cause her stress. And so there is no nexus between the stress that she claims to have suffered and the filing of the lawsuits in this case. And Dr. Vignott made no such connection either in his deposition. The fact that we took a damages deposition of Mrs. Tucker does not demonstrate that she had evidence. In fact, the reason we took that damages deposition was to show that she had no evidence. Frankly, Mrs. Tucker's response to discovery in this ---- in the underlying lawsuits that she brought was somewhat cavalier. I think we pointed out her response and her husband's response to questions and requests we made for damages evidence. And the response was, well, yeah, that's been mentioned to me a number of times, but I've just never gotten around to it. Well, the time to get around to it was when summary judgment motions were filed in the court below, and they never did then either. Judge Takasugi did the right thing, notwithstanding the thousands of pages of documents that were dumped on him. He went through it and he found that there was no competent evidence. For example, none of the documents were authenticated, even if we want to get to that level of detail. Judge Takasugi correctly found that there was no evidence that would permit them to get any further in this case on that summary judgment motion, and therefore granted that one and denied the others. Thank you, Your Honor. In her deposition, did she say anything about the fact that the underlying lawsuit was causing her difficulty and stress? Well, I think – I don't recall exactly what she said in her deposition, but my recollection is that it was undifferentiated, that she was talking about the stress that she had. When she got specific, she pinpointed it to the death threat she was receiving, the ad that was in the source magazine that she claims was somehow targeting her and that we had nothing to do with. And the lyrics in a Tupac Shakur song, again, that we had nothing to do with, that incited people to do damage to her. That's what my recollection is that she was tying this to. Now, whether – I cannot represent to the Court that somewhere in that deposition did she not make some undifferentiated statement and it all started at the same time as these lawsuits. I think maybe she did do that, but I don't think that there was any nexus. A lot of things happened at the same time these lawsuits were filed. But I don't believe that any nexus was drawn between the file and the lawsuit. The first suit was filed against her, right? Your Honor, yes. The underlying lawsuits were filed against her. Yeah, it was filed against her and was claiming that all of the problems that she was creating for Tupac and the various singers. Now, why wouldn't that have been the result of the death threat? Up until that point, there was nothing that was involving her until that suit? That's not quite correct, Your Honor. Mrs. Tucker had been a political activist for some time and, in fact, had been a political activist on the subject of gangster rap, and some of us may well believe correctly so, and we're not here to try gangster rap, for some time. And she had gone to time-warner shareholder meetings and made her position clear. And Interscope and my clients, as their lawyers, had done nothing in terms of a lawsuit against Mrs. Tucker for her political activity. It was only when Mrs. Tucker crossed the line, and there's a letter in the record that's a very peculiar letter, where she says basically, we're going to negotiate, you and me, Mr. Knight, and are going to negotiate a new distribution agreement to replace Interscope's distribution agreement with Time Warner. That steps over the line. Well, we're not here to talk about the merits of that case. You dismissed it, and that's gone. So the question really is whether she was stressed by this suit being brought against her. And it's hard to think that one would not be stressed were you sued and put through all sorts of depositions and so forth, would you not be stressed? Your Honor, it is virtually impossible for me as a litigator, much less a defendant, not to be stressed by a lawsuit. Right. So I would concede that. But what I would say are two things. One is that in response to Judge Hugg's question, I do not believe that the death threat that was the source for stress was the ‑‑ was sourced in the filing of the lawsuit. But it may well have been as a result of the lawsuit. What was the timing? Did it come after the lawsuit, the death threats and all those things? She says that she has been receiving death threats for both prior to and after the lawsuits were filed. But some after. Well ‑‑ So why isn't this a question of an amount, not ‑‑ I think that there was stress all along, but why isn't this a question of how much stress was the result of the lawsuit and how much before? Well, I think the answer is, on summary judgment, it was her burden to show that it was ‑‑ that there was a nexus to the lawsuit. She never brought any of this information to the district court's attention. She did not even address the issue of stress or emotional distress to the district court. And there were cases like Carmen and Zaslaw, which say that district court is not obliged to go through the thousands of pages of evidence that you put before it to find any of this evidence. She didn't put it before the court. And again, she didn't draw a ‑‑ we're entitled to, in a sense, on summary judgment, put her to her ‑‑ to her ‑‑ her burden as a defendant. And it's her burden to show the nexus between the lawsuits and ‑‑ Well, how do you show that nexus other than to draw some inferences? The lawsuit was started. The death threats occur. She says she's stressed. Isn't that enough to take it to trial? Well, it might have been enough had she filed a declaration to that effect. But she didn't. Instead, she, through her counsel, made a tactical decision to inundate the court with thousands of pages of articles, deposition transcripts, irrelevant material, without any declaration from her saying that. Well, how about the deposition material that was part of the record of the judge? Wouldn't that have provided some indication of stress as a result of the lawsuit? Well, two things. One, that judge and you and me have the same problem, which is if it did, then we're entitled to know where in that deposition transcript it did do that, under Local Rule 56, under Carman, under Zasla. It is not enough to file 20 or 30 deposition transcripts with the court and just say, it's in there somewhere. Now, I don't know if it ever is in there, making that nexus. And that's what I'm suggesting to you. She is clearly a woman under stress, but she is under stress from a lot of things pre – because she's a political activist before the lawsuit is filed and afterwards. And the things that she is claiming about do not flow naturally from the filing of the lawsuits. And so she didn't make that connection. And more importantly, she didn't, for the district court, argue either in her brief that there's no mention of emotional distress in her brief whatsoever, and nor did she, in the response to the separate statement, ever point to any evidence and say, this is the connection to the stress I'm suffering and the lawsuits that you filed. And that was her burden on summary judgment. Thank you, Your Honor. Thank you, counsel. May I just have one moment? Yes. Yes, you may. We went over with Mr. Greenberg. First of all, nexus, basic restatement of torts law, if there are potentially various causes that are called concurrent causes, the burden switches to the defense to show that their problems were not. So on the question of nexus, restatement, basic law, in terms of actually pointing out pages and depositions, my response mentioned the deposition, the page number where she said she was stressed. And in response to your question, the stress all started with this lawsuit. I mean, if you want to follow what started first, the lawsuit started, the threats followed, the stress followed. And just as you said, Your Honor, I mean, who wouldn't be stressed by 11 days of deposition? I've never seen in my life 11 days of deposition, 2,700 pages of deposition. All right. Thank you, counsel. This session of Tucker v. Kenner will be submitted. And we've taken National Corporate Tax Credit Fund v. Bond Purchase off calendar. So this court will be adjourned for today. Thank you.
judges: Hug, B. Fletcher, Wardlaw